Filed 9/14/22  P. v. Johnson CA3
Opinion following transfer from Supreme Court

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CONRAD J. JOHNSON, JR., et al.,<br><br>Defendants and Appellants. | C076191<br><br>(Super. Ct. No. 12F01431) |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LAM QUOC LUONG,<br><br>Defendant and Appellant. | C076607<br><br>(Super. Ct. No. 12F01431)<br><br>ON TRANSFER<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

1

THE COURT:

It is ordered that the opinion filed in this case on August 18, 2022, be modified as follows:

On page 41, Discussion part IX, third sentence, delete "(15 percent of 654 is 97.8)" and replace with "(15 percent of 652 is 97.8)" so that the sentence now reads:

Luong, however, was in custody for 652 days (from the time of his arrest on August 2, 2012, through his sentencing on May 16, 2014), which entitled him to 97 days of good conduct credit (15 percent of 652 is 97.8).

This modification does not change the judgment.

The petition for rehearing is denied.

FOR THE COURT:

_____/S/_____
ROBIE, Acting P. J.

_____/S/_____
MAURO, J.

_____/S/_____
DUARTE, J.

2

Filed 8/18/22  P. v. Johnson CA3 (unmodified opinion)
Opinion following transfer from Supreme Court

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CONRAD J. JOHNSON, JR., et al.,<br><br>Defendants and Appellants. | C076191<br><br>(Super. Ct. No. 12F01431) |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LAM QUOC LUONG,<br><br>Defendant and Appellant. | C076607<br><br>(Super. Ct. No. 12F01431)<br><br>ON TRANSFER |

On transfer from the California Supreme Court based on a change in the law, this court considers the case again.

The Viet Pride and Khome Zong Tong (KZT) gangs are rivals of the Hop Sing street gang.  In 2012, Kao Saechao, a Hop Sing gang member, entered a store in a shopping center in South Sacramento, a gathering place for KZT and Viet Pride members who consider the shopping center their territory.  A minute later, defendants Jhordan

1

Villanueva and Danny Dien Do, Viet Pride gang members, appeared outside the store and were joined soon after by defendants Roderick Bernard Randall and Conrad J. Johnson, Jr., KZT gang members. Villanueva, Do, and Randall challenged Saechao to come outside and fight. Saechao, fearing there would be a shootout if he left the store, called other Hop Sing members for help, and they arrived shortly thereafter in a red Honda. Shots were fired at the Honda by defendants Lam Quoc Luong and Johnson, and occupants were hit.

A jury convicted defendants Luong, Villanueva, Do, Randall, and Johnson for the attempted murders of J.T., S.V., J.S., and K.S. It also found Randall guilty of possessing MDMA[1] for sale. In addition, the jury also found true allegations that certain offenses were committed willfully, deliberately, and with premeditation, a principal intentionally and personally used a firearm, a principal intentionally and personally discharged a firearm, a principal personally caused great bodily injury to a person other than an accomplice, and certain offenses were committed for the benefit of a criminal street gang, KZT.

The trial court found true allegations that Johnson and Randall each served a prior prison term and had been convicted of a serious felony. It sentenced Luong to an aggregate term of 64 years to life in state prison; Villanueva and Do to aggregate terms of 32 years to life in state prison; Randall to an aggregate term of 88 years to life in state prison; and Johnson to an aggregate term of 83 years to life in state prison.

In their opening appellate briefs, defendants contended the trial court committed various evidentiary, instructional, and sentencing errors. They also asserted there was insufficient evidence to support their convictions and that the case must be remanded to allow the trial court to exercise its newly acquired discretion to strike the firearm enhancements imposed pursuant to Penal Code section 12022.53.[2] In its original

---

[1] Methylenedioxymethamphetamine, colloquially known as "Ecstasy."

[2] Undesignated statutory references are to the Penal Code.

opinion, this court concluded Randall's conviction for possession of MDMA for sale had to be reversed because there was insufficient evidence that he knew of the drug's presence or exercised dominion and control over the same.  As for the remainder of the judgments, this court ordered a remand for correction of custody credits and to allow the trial court to exercise its discretion whether to strike any of the firearm enhancements and, if appropriate, to resentence defendants, but otherwise affirmed.

The California Supreme Court granted review and transferred the matter back to this court with directions to vacate our decision and reconsider the cause in light of Senate Bill No. 775 (2021-2022 Reg. Sess.) which allows defendants to raise on direct appeal their claims concerning the effect of amendments to laws relating to attempted murder enacted in Senate Bill No. 1437 (2017-2018 Reg. Sess.).  (§ 1172.6, subd. (g).)[3] This court vacated its decision and we now reconsider the entire matter.

We now conclude (1) we will reverse the attempted murder convictions of Do, Randall, and Villanueva, along with the accompanying enhancements, but we will affirm the attempted murder convictions of Luong and Johnson; (2) relevant to whether Do, Randall, and Villanueva may be retried, there was sufficient evidence to convict Do, Randall, and Villanueva of attempted murder; (3) the trial court did not err in declining to instruct the jury on the crime of being an accessory to a felony; (4) the trial court properly instructed the jury using CALCRIM No. 334 [accomplice testimony must be corroborated:  dispute whether witness is accomplice] instead of CALCRIM No. 335 [accomplice testimony: no dispute whether witness is accomplice]; (5) the trial court properly admitted evidence that cars parked in a witness's driveway were vandalized the night before the witness testified; (6) the trial court was not required to instruct on unanimity; (7) any error in admitting evidence of Villanueva's prior contacts with police was harmless beyond a reasonable doubt; (8) Randall's conviction for possession of

---

[3] Effective June 30, 2022, section 1170.95 was recodified without substantive change as section 1172.6.  (Stats. 2022, ch. 58, § 10.)

3

MDMA for sale must be reversed because there was insufficient evidence; (9) Luong is entitled to additional custody credit; (10) we will remand the matter to permit the trial court to exercise its discretion whether to strike the firearm enhancements under section 12022.53; (11) we will remand the matter to permit the trial court to exercise its discretion whether to strike the prior serious felony enhancements; (12) the gang enhancements must be reversed and remanded for retrial as a result of legislative changes; (13) the trial court, on remand, must allow Luong to make a record of information for an eventual youth offender parole hearing; and (14) Luong, on remand, may request a hearing to present evidence on his ability to pay fines and assessments.

To summarize, we will reverse the attempted murder convictions of Do, Randall, and Villanueva (the People may seek retrial); reverse Randall's conviction for possession of MDMA for sale; affirm the attempted murder convictions of Luong and Johnson but reverse the associated gang enhancements, vacate the sentences, and remand; and direct the trial court to properly reflect Luong's custody credit, allow Luong to make a record of information for an eventual youth offender parole hearing, allow Luong to request a hearing on his ability to pay fines and assessments, exercise its discretion with respect to striking firearm and prior serious felony conviction enhancements, and conduct further proceedings consistent with this opinion.

BACKGROUND

On the afternoon of January 12, 2012, Kao Saechao, a validated member of the Hop Sing street gang, entered a store with his girlfriend at a shopping center in South Sacramento to purchase water. The shopping center is a known gathering place for members of the KZT and Viet Pride street gangs, rivals of the Hop Sing street gang. There were at least six surveillance cameras located inside and outside the store. The cameras recorded a significant portion of the activities and movements of defendants, Saechao, and the shooting victims prior to and at the time of the shooting. The surveillance videos were played for the jury and admitted into evidence.

A minute after Saechao and his girlfriend entered the store, two Viet Pride gang members, Villanueva and Do, appeared outside the store. They returned a few minutes

4

later with two KZT gang members, Randall and Johnson, and former Viet Pride gang member Jimmy Luu. All five men stood in the store's doorway and peered inside.

Villanueva and Do remained outside the store, called Saechao "Hop Chop," told him that he was in their territory, and challenged him to come outside and fight. "Hop Chop" is a derogatory term for a Hop Sing gang member. Saechao believed he would get jumped if he went outside and that there would be a shootout if he attempted to drive away, so he called others for help.

Soon after, Randall entered the store and spoke to Saechao while Villanueva and Do remained outside. Randall told Saechao Villanueva and Do knew Saechao was a Hop Sing gang member and to go outside and talk like a man.

On the day in question, Randall was wearing a court-ordered GPS tracking device that recorded his location once every minute and the speed of his movements. While Randall was inside the store encouraging Saechao to go outside, Saechao's friends came to the shopping center in a red Honda. Villanueva and Do looked in the direction of the red Honda and immediately walked away from the store. Randall left the store a few seconds later as the occupants of the red Honda—J.T., S.V., J.S., and K.S.—were starting to walk toward the store. Randall yelled, "Chops, light them up." Shots were fired at the red Honda and its occupants from two directions. S.V. was shot in the back of his right leg, and J.T. was shot twice in the head. Most, if not all, of the occupants of the red Honda were members of Hop Sing.

Pursuant to a plea bargain, Luu testified for the prosecution at trial. When he arrived at the shopping center on the day in question, he saw Randall and Johnson looking toward the store from behind a dumpster, and Villanueva and Do outside the store. After getting some coffee, he walked to the store to see what was going on and was told by Villanueva or Do that there was a Hop Sing gang member inside. Luu peeked inside, saw an Asian male and an Asian female at the counter, and walked back to a cafe where he stood outside watching people gamble. He saw KZT gang members Steven Nat and Luong sitting in a black BMW parked near where the men were gambling. Nat was in the driver's seat, and Luong was in the backseat wearing a

5

sweatshirt with the hood pulled up over his head. Shortly thereafter, the black BMW moved and parked next to a Vietnamese restaurant in the same shopping center.

Luu saw the red Honda pull into the shopping center about 10 minutes later. "[T]he car screeched in, pulled in fast, and then [a] couple of people hopped out [of] the car." He heard a gunshot almost immediately thereafter, turned around, and saw Johnson running with a "shiny gun." He also saw Luong fire a "fully automatic" firearm from the sunroof of the black BMW as it rolled past the red Honda. Luu heard two sets of shots: two pops followed by "the other gun . . . letting loose." The gunshots came from different directions. When asked about his understanding of the relationship between KZT and Viet Pride on the date of the shooting, Luu responded, "They had one motive. They dislike Hop Sing."

Two types of ammunition were recovered from the scene: 17 nine-millimeter bullets and casings and thirteen .45-caliber bullets and casings. Most of the .45-caliber casings were found near the dumpsters in the parking lot.

After the shooting, a witness whose house backed up to the shopping center described seeing an individual wearing a black baseball cap with grey or white writing on the front and carrying a handgun jump over the fence and run toward a nearby street. The police set up a perimeter around the area and knocked loudly on the door at a house rented by Randall. When no one answered, the police obtained a search warrant. When law enforcement officers arrived at Randall's rental home, Luong's car was parked in the driveway. Johnson exited the house that evening and he was the only person inside. Among other things, police found a .45-caliber pistol with an extended magazine inside a toilet tank. It was later determined that the .45-caliber casings recovered at the scene had been fired by the pistol found inside the toilet tank. A black baseball cap matching the one described by the witness and the one Johnson was seen wearing in the surveillance video taken outside the store was found in the bottom of a trash can inside the residence. Johnson's hands tested positive for gunshot residue.

After the shooting, Luong and Nat went to Ann N.'s house. Ann was friends with Nat's girlfriend, Michelle B. The black BMW used in the shooting belonged to Michelle,

6

who had lent the car to Nat for the day. Nat called Michelle at work and had Ann go get Michelle and bring her back to Ann's house. When Michelle arrived, her black BMW was parked in Ann's garage. According to Michelle, Nat seemed "[k]ind of worried," while Luong appeared "very calm." Luong told Michelle "to get rid of the car . . . to get rid of the evidence." More particularly, he told her to "burn" the car or do an "I-job," meaning "damage the whole car so that way the insurance could pay for the whole car." Michelle left the car in Ann's garage for several months before selling it to someone in Salinas. The car's new owner found an expended nine-millimeter shell inside. Ballistics testing revealed that the shell found in Michelle's car was fired from the same gun as the nine-millimeter casings found at the scene.

Taizo Takahashi, a detective with the Sacramento County Sheriff's Department, testified for the prosecution as an expert on Asian gangs. Takahashi had spent the past two years working as a detective in the gang suppression unit. Prior to that, he had spent time working on the Asian gang task force and as a gang intelligence officer at the Rio Cosumnes Correctional Center. Takahashi's contacts with gang members in his current assignment included proactively contacting gang members and gathering information about gang members and the gangs themselves, interviewing gang members while investigating gang-related crimes, and speaking to gang members who were victims of crime. He also gathered information about gangs by reviewing reports and talking to other law enforcement officers. He estimated that he had spoken to at least 100 Asian gang members, investigated at least 20 Asian gang-related crimes, and reviewed at least 100 reports regarding such crimes.

Takahashi was familiar with KZT and Viet Pride, explaining that both had been recognized by the Sacramento County Sheriff's Department and virtually every other law enforcement agency in the surrounding areas as Asian gangs. The two gangs were aligned and shared a close relationship. Both gang's primary rival was Hop Sing. According to Takahashi, the rivalry between Viet Pride and Hop Sing was "so deep that the likelihood of something very violent happening when their paths crossed [was] very

high." The shopping center where the shootings occurred was considered KZT and Viet Pride turf.

Takahashi became familiar with KZT through street contacts and interviews with KZT gang members, reports that he reviewed, and a network of Asian gang investigators. According to Takahashi, Randall was recognized by Asian gang experts as a leader, if not the leader, of KZT. Takahashi opined that KZT's primary activities included burglary, possession for sale of methamphetamine and marijuana, possession of firearms, carrying concealed weapons, carrying loaded firearms in public places, attempted murder, and shooting at occupied dwellings. He testified about several incidents that resulted in the conviction of KZT gang members.

Takahashi had quite a few contacts with Viet Pride members in the past, although his contacts more recently had been limited to around five. A number of Viet Pride gang members had tattoos that read: "Rest in Peace, Gia Huynh or aka Yogi." Takahashi explained that Gia Huynh was a Viet Pride gang member who was killed execution style in the shopping center in 2010. The primary activities of Viet Pride included carrying concealed firearms, possession of methamphetamine for sale, and possession of firearms.

Takahashi further testified that Hop Sing was an Asian street gang, and its primary activities included "drive-by shootings, up to and including homicide." According to Takahashi, many Hop Sing gang members "have been found with weapons as well as loaded weapons, concealed weapons."

Takahashi opined that defendants' actions benefited KZT, explaining that "[w]hen a gang member shows up on your territory, there is an expectation of a reaction to that sign of disrespect. . . . [¶] So that sign of disrespect has to be addressed. And in this case it was by those involved in this case by confronting him, and if the allegations are true, . . . ultimately shooting at them." According to Takahashi, it "not only bolsters the respect that they have . . . but it . . . further instills fear in their rivals as well as their community . . . ." Takahashi further opined that if members of Viet Pride confronted a member or associate of Hop Sing in a known KZT/Viet Pride territory, challenged him to a fight, and called him "Hop Chop," it would be reasonably foreseeable that a shooting

8

might occur. The same would be true if a member of KZT confronted a member or associate of Hop Sing in a known KZT/Viet Pride territory and told him to exit the store to confront other KZT and Viet Pride gang members.

The jury found defendants Luong, Villanueva, Do, Randall, and Johnson guilty of the attempted murders of J.T. (count one), S.V. (count two), J.S. (count three), and K.S. (count four) (§§ 664, 187, subd. (a)). The jury found Randall guilty of possessing MDMA for sale. (Health & Saf. Code, § 11378; count five.) The jury also found true allegations that counts one through four were committed willfully, deliberately, and with premeditation (§ 664, subd. (a)); a principal intentionally and personally used a firearm in the commission of counts one through four (§ 12022.53, subds. (b), (e)(1)); a principal intentionally and personally discharged a firearm in the commission of counts one through four (§ 12022.53, subds. (c), (e)(1)); a principal personally caused great bodily injury as defined in section 12022.7 to a person other than an accomplice in the commission of counts one and two (§ 12022.53, subds. (d), (e)(1)); and counts one through five were committed for the benefit of, at the direction of, or in association with, a criminal street gang, to wit, KZT, with the specific intent to promote, further, or assist in criminal conduct by said gang members (§ 186.22, subd. (b)(1)).

In a bifurcated proceeding, the trial court found true allegations that Johnson and Randall each served a prior prison term within the meaning of section 667.5, subdivision (b), and had been convicted of a serious felony within the meaning of the three strikes law (§§ 667, subds. (b)-(i) & 1170.12) and section 667, subdivision (a).

The trial court sentenced Luong to an aggregate term of 64 years to life in state prison, consisting of two consecutive terms of seven years to life on counts one and two, plus two consecutive terms of 25 years to life for the firearm enhancements under section 12022.53, subdivisions (d) and (e)(1). It imposed concurrent sentences on counts three and four.

The trial court sentenced Villanueva and Do to aggregate terms of 32 years to life in state prison, consisting of seven years to life on count one, plus a consecutive 25 years

9

to life for the firearm enhancement under section 12022.53, subdivisions (d) and (e)(1). It imposed concurrent sentences on counts two, three, and four.

The trial court sentenced Randall to an aggregate term of 88 years to life in state prison, consisting of two consecutive terms of 14 years to life on counts one and two (seven years, doubled for the prior strike), plus two consecutive terms of 25 years to life on the firearm enhancements under section 12022.53, subdivisions (d) and (e)(1), plus two consecutive terms of five years for the prior serious felony enhancements. It imposed concurrent sentences on counts three, four, and five, and it struck the prior prison term enhancements.

The trial court sentenced Johnson to an aggregate term of 83 years to life in state prison, consisting of two consecutive terms of 14 years to life on counts one and three (seven years, doubled for the prior strike), plus a consecutive 25 years to life on the firearm enhancement under section 12022.53, subdivisions (d) and (e)(1) on count one, plus a consecutive 20 years on the firearm enhancement under section 12022.53, subdivisions (c) and (e)(1) on count three, plus two consecutive terms of five years for the prior serious felony enhancements. It imposed concurrent sentences on counts two and four, and struck the prior prison term enhancements.

## DISCUSSION

### I

We begin with a discussion of recent legislative changes to attempted murder liability because those changes require reversal of the attempted murder convictions of Do, Randall, and Villanueva.

Senate Bill No. 1437, enacted after the trial in this case, limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder. (*People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842-843 (*Gentile*), superseded by statute as stated in *People v. Hola* (2022) 77 Cal.App.5th 362, 370 (*Hola*).) As amended, section 188 now "bars a conviction for first or second degree murder under a natural and probable consequences theory." (*Gentile,* at p. 846.) "Because section 188,

subdivision (a)(3), prohibits imputing malice based solely on participation in a crime, the natural and probable consequences doctrine cannot prove an accomplice committed attempted murder.  Accordingly, the natural and probable consequences doctrine . . . is now invalid." (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.)  In its original opinion, this court held that Villanueva, Do, and Randall were required to file a postconviction petition for relief under Senate Bill No. 1437.  Later, however, the Legislature, in Senate Bill No. 775, amended former section 1170.95 to allow a defendant to assert the retroactive effect of Senate Bill No. 1437 on direct appeal.  "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill [No.] 1437 . . . ." (§ 1172.6, subd. (g).)  The California Supreme Court transferred the case back to this court to reconsider the cause in light of Senate Bill No. 775.

The People now agree with Do, Randall, and Villanueva that their convictions for attempted murder are no longer valid because the convictions may have been based on the natural and probable consequences doctrine.  However, the People argue that there is no similar error with respect to the attempted murder convictions of Luong and Johnson because they were direct perpetrators, not aiders and abettors.

In addition to jury instructions on attempted murder as a direct perpetrator, the trial court instructed the jury on two theories of aiding and abetting:  direct aiding and abetting (defendant intended to aid in the commission of the charged crime) (CALCRIM No. 401) and aiding and abetting under the natural and probable consequences doctrine (defendant aided and abetted a public nuisance with the natural and probable consequence being an attempted murder) (CALCRIM No. 403).  The latter theory is now invalid.

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reviewing courts refer to this as alternative-theory error.  [Citation.]" (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 592 (*Glukhoy*), review granted July 27, 2022, S274792.)  We assess prejudice using the harmless beyond

11

a reasonable doubt standard.  (*Ibid*.)  "Under that standard, '[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt.'  [Citation.]  The reviewing court asks: ' "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" '  [Citation.]"  (*Id*. at p. 593, italics omitted.)

As the People acknowledge, Do, Randall, and Villanueva were not shooters, and the prosecutor argued in closing argument that these defendants were guilty under both theories of aiding and abetting:  direct aiding and abetting and aiding and abetting under the natural and probable consequences doctrine.  Because the evidence of direct aiding and abetting was not overwhelming as compared to aiding and abetting under the natural and probable consequences doctrine, we cannot say with any confidence that the jury did not rely on a natural and probable consequences theory.  We therefore cannot conclude the error in instructing the jury on the natural and probable consequences doctrine was harmless beyond a reasonable doubt.  We will reverse the attempted murder convictions of Do, Randall, and Villanueva, with their associated enhancements.

Do, Randall, and Villanueva also argue, as they did in their original briefing, that the evidence was insufficient to convict them of attempted murder on any aiding and abetting theory.  Therefore, they reason, they cannot be retried for the attempted murders. We disagree.  As we held in the original opinion (and reiterate in the next part of this discussion), there was sufficient evidence to convict Do, Randall, and Villanueva under the now-invalid theory of aiding and abetting under the natural and probable consequences doctrine.  Even though the convictions under the now-invalid theory cannot stand, the People may retry the attempted murder counts and present evidence and argument under one or more currently valid theories.  "When there has been a postconviction change in the statutory or decisional law that invalidates a theory upon which the conviction was based and reversal is warranted, appellate courts remand the case to the trial court to allow the prosecution to retry the defendant on a legally valid theory."  (*Hola, supra*, 77 Cal.App.5th at p. 371; see also *People v. Chiu* (2014) 59

12

Cal.4th 155, 168 (*Chiu*) [treating the change of law as instructional error and allowing retrial under a valid theory].)  On remand, the People may seek to retry Do, Randall, and Villanueva for the alleged counts of attempted murder and related enhancements.

While we hold that the attempted murder convictions of Do, Randall, and Villanueva must be reversed, we agree with the People that Senate Bill No. 1437 does not also invalidate the attempted murder convictions of Luong and Johnson.  Unlike Do, Randall, and Villanueva, who were not shooters, Luong and Johnson both discharged firearms at the victims in the red Honda.  Luong was in the backseat of the black BMW.  A witness saw him rise up through the sunroof of the car and fire a fully automatic firearm at the red Honda.  Johnson was behind a dumpster when the shooting began and was seen running from the area with a firearm.  A search of his home revealed a firearm that forensically matched the casings left at the scene where Johnson had been.  Johnson's hands tested positive for gunshot residue soon after the shootings.

Although the jury was instructed on both direct perpetration and aiding and abetting as to Luong and Johnson, the overwhelming evidence was that they were direct perpetrators of the attempted murders.  Luong makes no argument in his supplemental brief that he was convicted on an aiding and abetting theory.  He joins in arguments of the other defendants, but none of them argued Luong was not a direct perpetrator.  Johnson claims that a witness who identified him as a shooter relied on a photograph, not on the witness's memory.  However, in addition to the witness testimony, the firearm was found in Johnson's home, and gunshot residue was found on his hands.  Thus, the record does not support an argument Luong and Johnson were not direct perpetrators of the attempted murders.

Because Luong and Johnson were direct perpetrators of the attempted murders, any error in instructing on aiding and abetting under the natural and probable consequences doctrine was harmless beyond a reasonable doubt.  (*Glukhoy, supra*, 77 Cal.App.5th at p. 592, review granted.)  They are not entitled to reversal of their convictions for attempted murder.

13

## II

Villanueva and Do contend, as they did in their original briefing, that there is insufficient evidence to convict them on *any* aiding and abetting theory. Specifically, they argue the evidence cannot support their convictions for attempted murder under either a direct aider and abettor theory or under the natural and probable consequences doctrine. Randall joins these arguments. Therefore, they reason, they cannot be retried for the attempted murders.

We are not currently in a position to say that on remand, the People will be unable to present sufficient evidence to convict Villanueva, Do, and Randall on a currently valid theory of aiding and abetting. We simply conclude that because there was sufficient evidence to convict Villanueva, Do, and Randall on a now-invalid aiding and abetting theory based on the natural and probable consequences doctrine -- a theory that was legally valid at the time of the convictions -- the People may seek to retry them under any currently valid theory. (*Hola, supra*, 77 Cal.App.5th at p. 371.) While it may seem counter-intuitive that we spend much of the remainder of this part of the discussion addressing the sufficiency of the evidence for a now-invalid theory, we do so to explain why the People may seek retrial.

### A

"Substantial evidence is evidence that is ' "reasonable in nature, credible, and of solid value." ' [Citation.] 'In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.] We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence. [Citation.] 'The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on " 'isolated bits of evidence.' " [Citation.]' [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 919 (*Medina*).)

"Under California law, a person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator. (§ 31.)"

14

(*People v. Prettyman* (1996) 14 Cal.4th 248, 259 (*Prettyman*).) "[A]n aider and abettor is a person who 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' " (*Ibid.*)

In *Prettyman*, the California Supreme Court explained: "It sometimes happens that an accomplice assists or encourages a confederate to commit one crime, and the confederate commits another, more serious crime (the nontarget offense). Whether the accomplice may be held responsible for that nontarget offense turns not only upon a consideration of the general principles of accomplice liability set forth [above], but also upon a consideration of the 'natural and probable consequences' doctrine." (*Prettyman, supra*, 14 Cal.4th at pp. 259-260.) The court added: "Under California law, a person who aids and abets a confederate in the commission of a criminal act is liable not only for that crime (the target crime), but also for any other offense (nontarget crime) committed by the confederate as a 'natural and probable consequence' of the crime originally aided and abetted. To convict a defendant of a nontarget crime as an accomplice under the 'natural and probable consequences' doctrine, the jury must find that, with knowledge of the perpetrator's unlawful purpose, and with the intent of committing, encouraging, or facilitating the commission of the target crime, the defendant aided, promoted, encouraged, or instigated the commission of the target crime. The jury must also find that the defendant's confederate committed an offense other than the target crime, and that the nontarget offense perpetrated by the confederate was a 'natural and probable consequence' of the target crime that the defendant assisted or encouraged." (*Id.* at p. 254.)

As the California Supreme had further explained: "A nontarget offense is a ' "natural and probable consequence" ' of the target offense if, judged objectively, the additional offense was reasonably foreseeable. (*Medina, supra*, 46 Cal.4th at p. 920.) The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. (*Ibid.*) Rather, liability ' "is measured by whether a reasonable person

15

in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." ' (*Ibid.*) Reasonable foreseeability 'is a factual issue to be resolved by the jury.' (*Id.* at p. 920.)" (*Chiu, supra*, 59 Cal.4th at pp. 161-162.) For a shooting to be reasonably foreseeable in the gang context, it is not necessary for there to have been a prior discussion of or an agreement to a shooting, or for a gang member to have known a fellow gang member was in fact armed. (*Medina,* at p. 924.)

Here, the prosecution's theory at trial was that Johnson and Luong were the shooters, and that Randall, Villanueva, and Do were guilty either as direct aiders and abettors of the attempted murders or under the natural and probable consequences doctrine. The jury was instructed in the language of CALCRIM No. 403 in pertinent part as follows:

"Natural and Probable Consequences: Before you may decide whether a defendant is guilty of attempted murder as an aider and abettor as charged in Counts One, Two, Three, and Four, you must decide whether he is guilty of disturbing the peace by challenging someone to fight in violation of Penal Code section 415.

"To prove that the defendant is guilty of attempted murder as an aider and abettor, the People must prove that:

"1. The defendant is guilty of challenging someone to fight;

"2. During the commission of challenging someone to fight, a coparticipant in that crime of challenging someone to fight committed the crime of attempted murder; and

"3. Under all the circumstances, a reasonable person in the defendant's position would have known that the commission of attempted murder was a natural and probable consequence of the commission of challenging someone to a fight.

"A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator."

Defendants do not dispute that they are guilty of the target offense of challenging Saechao to a fight for purposes of appeal. Rather, they assert that, even assuming they are guilty of the target offense, there is no evidence to support a finding that (1) the

16

perpetrators of the attempted murders—Luong and Johnson—participated in the crime of challenging someone to fight, or (2) the attempted murders were a reasonably foreseeable consequence of challenging Saechao to a fight because it is undisputed that the shooting victims were not present at the time the challenge was issued.

However, viewing the record as a whole and considering the evidence in the light most favorable to the verdict, there was sufficient evidence to support a finding that Luong and Johnson participated in a common plan to assault Saechao, which included challenging him to a fight. The evidence adduced at trial showed that Villanueva and Do were members of Viet Pride, Luong, Johnson, and Randall were members of KZT, and Viet Pride and KZT were aligned and shared a common enemy, Hop Sing. Randall was a leader, if not the leader, of KZT. Villanueva, Do, Randall, and Johnson were videotaped peering inside the store together and milling around outside thereafter. Luong's car was parked in Randall's driveway around the corner from the shopping center on the day of the shooting. Luong and Johnson were in a position to shoot just prior to the shooting and began shooting immediately after Randall yelled, "Chops, light them up."

The jury reasonably could infer that Luong and Johnson knew of Saechao's presence inside the store and Villanueva, Do, and Randall's efforts to get Saechao to leave the store and engage in a fight, and that Luong and Johnson encouraged and/or facilitated the commission of the target offense by putting themselves in a position to assault (shoot) Saechao if and when he exited the store. Stated another way, there was ample evidence to support the jury's finding that during the commission of challenging someone to a fight, a coparticipant in that crime committed the crime of attempted murder. That Luong and Johnson did not challenge Saechao to a fight or otherwise encourage him to go outside is of no consequence. (*People v. Smith* (2014) 60 Cal.4th 603, 613 ["The statutes and, accordingly, the natural and probable consequences doctrine, do not distinguish among principals on the basis of whether they directly or indirectly aided and abetted the target crime . . . ."].)

There was also ample evidence to support the jury's finding that a reasonable person in Villanueva, Do, and Randall's positions would have known that the

17

commission of attempted murder was a natural and probable consequence of challenging Saechao to a fight. As the jury was instructed, in deciding whether a consequence is natural and probable, it was required to consider all of the circumstances established by the evidence. Those circumstances included the following: Villanueva, Do, and Randall knew Saechao was a member of a rival gang. Indeed, that was the stated basis for challenging him to a fight. Knowing that was the case, Villanueva and Do, with Randall's knowledge and support, effectively trapped Saechao inside the store by remaining outside. A reasonable person in Villanueva, Do, and Randall's positions would have or should have known that Saechao, who refused to leave the store, would likely call his fellow gang members for help and that the situation would escalate. Takahashi testified that it was common for members of all three gangs to carry firearms. He explained that "gang members never know when they're going to run into trouble. . . . [T]hey have to be ready to protect themselves at all times. . . . For instance, the rivalry between Hop Sing and Viet Pride is so deep that the likelihood of something very violent happening when their paths cross[ed] [was] very high." Takahashi had previously testified about two separate shootings of Viet Pride gang members by Hop Sing gang members, one of which occurred in the same shopping center two years earlier.

That the shooting victims were not present when Villanueva and Do challenged Saechao to fight is not dispositive. "The precise consequence need not have been foreseen." (*Medina, supra*, 46 Cal.4th at p. 927.) It is sufficient that under the factual circumstances of this case that a reasonable person in Villanueva, Do, and Randall's positions would have or should have known that a shooting was a reasonably foreseeable consequence of challenging a rival gang member to fight, and then trapping him inside a store in hostile territory. (*Ibid.*) Even if Villanueva, Do, and Randall reasonably could not have foreseen the attempted murders of the occupants of the red Honda, under the circumstances of this case, they would or should have known that a shooting was a reasonably foreseeable consequence of challenging Saechao to a fight. (*Ibid.*)

Because there was sufficient evidence to support Villanueva, Do, and Randall's attempted murder convictions under the now-invalid natural and probable consequences

18

doctrine, the People may seek to retry them under any currently valid theory. (*Hola, supra*, 77 Cal.App.5th at p. 371.)

Villanueva further contends he could not be convicted of attempted murder as the natural and probable consequence of challenging someone to a fight in violation of section 415, a misdemeanor, because a defendant cannot be convicted of attempted murder based on a trivial act. Do joins in the argument. But Villanueva and Do's commission of the target offense of challenging someone to a fight was not a trivial act under the circumstances of this case.

As Villanueva notes, in *Prettyman, supra*, 14 Cal.4th at page 269, the Supreme Court observed that "[m]urder . . . is *not* the 'natural and probable consequence' of 'trivial' activities. To trigger application of the 'natural and probable consequences' doctrine, there must be a close connection between the target crime aided and abetted and the offense actually committed." Villanueva appears to assume that a misdemeanor offense always necessarily involves a trivial act. He is mistaken.

In *People v. Canizalez* (2011) 197 Cal.App.4th 832, 853, our colleagues in the Second District Court of Appeal rejected a claim that a defendant cannot be convicted of murder as the natural and probable consequence of a misdemeanor. "Given that the natural and probable consequences doctrine looks to the reasonable likelihood that the nontarget [offense] will result from the target offense, it would appear that applying the label 'felony' or 'misdemeanor' to the target offense is not talismanic in deciding whether the aider and abettor can be convicted of a nontarget murder. The key factor is the ability to anticipate the likelihood that the nontarget offense will result from the target offense. We cannot look to the naked elements of the target crime but must consider the full factual context in which appellants acted." (*Id.* at p. 854.)

Given the full factual context in which Villanueva and Do acted, as previously discussed (challenging a rival gang member to a fight and effectively trapping him inside a store in hostile territory), the likelihood that a shootout would occur as the result of challenging Saechao to a fight was reasonably foreseeable. Accordingly, the jury was

19

properly instructed at the time that defendants could be convicted of attempted murder based on their conduct in challenging Saechao to a fight.

In addition, Villanueva claims the natural and probable consequences doctrine violated the separation of powers doctrine, the due process clause, and section 6 of the Penal Code because it is a judicial creation of a nonstatutory crime. Do joins in this argument. Again, we address these arguments merely to determine whether the People may seek retrial.

Villanueva argues his convictions for attempted murder, which were based on the judicially created natural and probable consequences doctrine, were invalid because the Legislature alone is empowered to define the elements of crimes. For authority, he cites article III, section 3 of the California Constitution. But that section merely states in general terms the idea that there must be a separation of powers among the coordinate branches of government. (See Cal. Const., art. III, § 3 ["The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."].) He also relies on case law interpreting section 6 of the Penal Code, which provides in relevant part that "[n]o act or omission . . . is criminal or punishable, except as prescribed or authorized by this code." In *Keeler v. Superior Court* (1970) 2 Cal.3d 619, 631, superseded by statute on other grounds as stated in *People v. Taylor* (2004) 32 Cal.4th 863, 870, the California Supreme Court described the section as embodying "a fundamental principle of our tripartite form of government, i.e., that subject to the constitutional prohibition against cruel and unusual punishment, the power to define crimes and fix penalties is vested exclusively in the legislative branch." Where the statutory language in the Penal Code is vague, however, " 'the statutory definition permits, even requires, judicial interpretation.' " (*Chiu, supra*, 59 Cal.4th at p. 164.)

Section 31, which establishes that aiders and abettors of crimes are treated as principals, does not define aiding and abetting and "does not expressly mention the natural and probable consequences doctrine." (*Chiu, supra*, 59 Cal.4th at p. 164.) Consequently, the courts "may . . . determine the extent of aiding and abetting liability

20

for a particular offense, keeping in mind the rational function that the doctrine is designed to serve and with the goal of avoiding any unfairness which might redound from too broad an application." (*Ibid.*)

In addition, the Supreme Court previously rejected challenges that the natural and probable consequences doctrine violates due process by eliminating the prosecution's obligation to prove malice. (See, e.g., *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 184-185.) It also previously ruled that the natural and probable consequences doctrine was "an 'established rule' of American jurisprudence" that had been embraced in California. (*Prettyman, supra*, 14 Cal.4th at p. 260; see also *People v. Gonzalez and Soliz* (2011) 52 Cal.4th 254, 300.) Because the natural and probable consequences doctrine was recognized at common law and at the time of the convictions had been firmly entrenched in California law as a theory of criminal liability (*Chiu, supra*, 59 Cal.4th at p. 163), Villanueva's argument to the contrary fails.

B

We next discuss the sufficiency of the evidence concerning the gang enhancements, applying the law existing at the time of trial. Because Villanueva challenged the true findings on the gang enhancements for insufficiency of evidence, we restate our opinion rejecting that contention. He contends there is insufficient evidence to establish Viet Pride or KZT's primary activities, or a pattern of criminal activity. We disagree.

A gang enhancement requires that the defendant commit the underlying felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).)

Before we address the merits of Villanueva's claim, we pause to note that the amended information alleged, and the jury found, that Villanueva committed the attempted murders "for the benefit of, at the direction of, or in association with, a criminal street gang, to wit, *KZT*, with the specific intent to promote, further, or assist in criminal conduct by *said gang members* . . . ." (Italics added.) Thus, the People were not

21

required to prove that Viet Pride met the requirements for a criminal street gang under section 186.22, subdivision (f). We understand that the evidence showed that Villanueva was a member of Viet Pride, not KZT. Villanueva's gang membership, however, is not dispositive.[4] Rather, the salient question is whether Villanueva committed the attempted murders for the benefit of, at the direction of, or in association with KZT, and with the specific intent to promote, further or assist in the criminal conduct of its members. (§ 186.22, subd. (b).) There is ample evidence in the record to support a finding that he did. As detailed above, Villanueva and Do committed the target crime of challenging someone to a fight in association with KZT members Randall, Johnson, and Luong, and evidence concerning Viet Pride's relationship with KZT and their common rival Hop Sing explained why members of the two gangs would cooperate in challenging a Hop Sing gang member to a fight.

Turning to the merits of Villanueva's claim, as it relates to KZT, the provisions of section 186.22 require proof of the existence of a "criminal street gang." (*People v. Vasquez* (2016) 247 Cal.App.4th 909, 922.) A "criminal street gang" is defined in terms of four elements: It must be "[(1)] any ongoing organization, association, or group of three or more persons, whether formal or informal, [(2)] having as one of its primary activities the commission of one or more [specified] criminal acts . . . , [(3)] having a common name or common identifying sign or symbol, and [(4)] whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, former subd. (f).)

The first and third elements are not at issue here. "To establish the second element, the nature of the gang's primary activities, the trier of fact may look to both the past and present criminal activities of the gang. [Citation.] Isolated criminal conduct,

---

[4] This is not to say that Villanueva's membership in Viet Pride is not relevant. It plainly is. The People, however, were not required to prove that Viet Pride was a "criminal street gang" under section 186.22, subdivision (f) for purposes of establishing the gang enhancement in this case.

however, is not enough. 'Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute.' [Citation.] Expert testimony based on an adequate factual foundation might also be sufficient. [Citation.]" (*In re Alexander L.* (2007) 149 Cal.App.4th 605, 611 (*Alexander L.*).) In *People v. Nguyen* (2015) 61 Cal.4th 1015, 1068, the California Supreme Court held that a gang expert's testimony that "some of the primary activities of the [gang in question] were 'homicides, attempted homicides, assaults, assault[s] with deadly weapons, home invasion robberies, burglaries, auto theft, narcotic sales,' " nearly all which were crimes enumerated in the statute, was sufficient.

With respect to the fourth element, pattern of criminal activity, "[a] gang engages in a 'pattern of criminal gang activity' when its members participate in 'two or more' statutorily enumerated criminal offenses (the so-called 'predicate offenses') that are committed within a certain time frame and 'on separate occasions, or by two or more persons.' " (*People v. Zermeno* (1999) 21 Cal.4th 927, 930.) The People may rely on evidence of the defendant's commission of a currently charged offense to satisfy this requirement. (*People v. Loeun* (1997) 17 Cal.4th 1, 10; accord, *People v. Tran* (2011) 51 Cal.4th 1040, 1046.) It is enough to show that a predicate crime was committed; a conviction is unnecessary. (*People v. Garcia* (2014) 224 Cal.App.4th 519.) The crimes necessary to establish a pattern of criminal gang activity need not be gang related. (*Alexander L., supra,*149 Cal.App.4th at p. 611.)

Takahashi testified that KZT's primary activities included burglary, possession for sale of methamphetamine and marijuana, unlawful possession of firearms, carrying concealed weapons, carrying loaded firearms in public, attempted murder, and shooting at occupied dwellings. He also provided details of several such crimes. In 2011, a KZT gang member was convicted of possessing 38 pounds of processed marijuana for sale and being a felon in possession of a firearm. In July 2010, a KZT gang member was convicted of being a minor in possession of a firearm in violation of section 29610. In October 2010, a member of the Asian Little Thug gang, a subset of KZT, was convicted

23

of assault with a deadly weapon. And in July 2010, a KZT gang member was convicted of conspiracy to transport narcotics for sale.

Villanueva does not dispute that the crimes asserted by Takahashi as KZT primary activities are among the criminal acts enumerated in section 186.22, former subdivision (e). (§ 186.22, former subd. (e)(3), (4), (5), (11), (32), (33).) Rather, he argues "[t]here was an inadequate basis for [Takahashi's] testimony" because he "cited to no specific basis for the source of his opinions." According to Villanueva, the testimony "may have been based on reliable sources, such as court records, or on entirely unreliable hearsay." Randall and Do join in this aspect of Villanueva's argument.

Takahashi testified that he had spoken to at least 100 Asian gang members, had numerous contacts with KZT gang members, investigated at least 20 Asian gang-related crimes, and reviewed at least 100 reports regarding such crimes. To the extent Villanueva claims that portions of Takahashi's testimony about gang primary activities was impermissibly based on hearsay, the claim lacks merit. A gang expert may testify to " 'non-case-specific general background information about [the gang], its rivalry with [another gang], its primary activities, and its pattern of criminal activity, even if it was based on hearsay sources.' " (*People v. Blessett* (2018) 22 Cal.App.5th 903, 944, review granted Aug. 8, 2018, transferred & decision vacated Sept. 15, 2021, S249250, quoting *People v. Meraz* (2016) 6 Cal.App.5th 1162, 1175, review granted March 22, 2017, transferred Aug. 29, 2018, S239442.)

Villanueva's reliance on *In re Nathaniel C.* (1991) 228 Cal.App.3d 990 (*Nathaniel C.*) in support of his argument that there was an inadequate foundation for Takahashi's testimony is misplaced. In *Nathaniel C.*, the Court of Appeal found that the evidence was insufficient to show that a primary activity of a particular gang (the Family) was the commission of any of statutorily specified offenses. (*Id.* at p. 1004.) The expert in that case testified that "the primary activity of all of the gangs in his area [was] criminal" and "gave a general list of the crimes he had in mind, only one of which—assault with a deadly weapon—[was] included among the . . . offenses specified in the statute." (*Id.* at pp. 1004-1005.) The expert "did not identify the Family as one of the gangs in his area"

24

and instead "made a point of stating that the Family's base is in San Bruno rather than his jurisdiction, South San Francisco." (*Ibid*.) The court reasoned that while the "primary activity" element is "a proper subject of expert opinion, here the opinion did not relate specifically to the Family and its activities. Thus, the evidence failed to establish that a primary activity of the Family is commission of one or more of the offenses specified by the statute." (*Id.* at p. 1005.)

In contrast, Takahashi's opinion related specifically to KZT and its activities. Moreover, in addition to testifying about KZT's primary activities, Takahashi offered detailed descriptions of various incidents that resulted in the conviction of KZT gang members for statutorily enumerated offenses.

Villanueva also relies on *Alexander L., supra*, 149 Cal.App.4th 605, in support of his argument that Takahashi's testimony lacks foundation. In that case the Court of Appeal found there was insufficient evidence that a primary activity of the gang in question was committing one or more of the enumerated crimes. There, the gang expert provided the following testimony on the issue of primary activities: " 'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' " (*Id.* at p. 611.) There was no testimony regarding the basis of the expert's knowledge, and on cross-examination, the expert acknowledged that the vast majority of cases with which he was familiar involved graffiti. (*Id.* at p. 612.)

In contrast, Takahashi's testimony was based in part on his personal experience in investigating gang crimes, contacting gang members, reading reports of gang crimes, and communicating regularly with fellow police officers. He also identified multiple statutorily enumerated offenses that served as KZT's primary activities and provided specific examples of such crimes that had been committed by KZT gang members.

Villanueva also asserts "[t]he evidence supporting the 'pattern of criminal gang activity' element was . . . insufficient because of the limiting instruction given [to] the jury." The jury was instructed that it could consider evidence of gang activity for the

limited purpose of (1) deciding whether a defendant acted with the knowledge, intent, or purpose that are required for the gang enhancement, (2) deciding whether a defendant had a motive to commit any of the crimes charged, (3) evaluating the credibility or believability of a witness, and (4) considering the facts and information relied on by an expert witness in reaching his or her opinion. The jury was explicitly instructed, "You may not consider evidence of gang activity for any other purpose. And specifically what I'm talking about is you may not conclude from evidence of gang activity in general that any defendant is a person of bad character or that he has a disposition to commit crime." According to Villanueva, this limiting instruction precluded the jury from considering Takahashi's testimony concerning gang activity in deciding whether members of KZT were engaged in a pattern of criminal activity, and without that testimony, there was no evidence to support a finding that members of KZT were so engaged.

As detailed above, Takahashi testified in detail about the history and culture of KZT, he described its primary activities, and provided specific examples of those criminal activities. Of particular significance here, he based his opinion that KZT was a criminal street gang in part on such information. Villanueva acknowledges that the jury was permitted to consider the evidence of gang activity when considering the facts and information relied on by Takahashi in reaching his opinions, but appears to assert that the jury nevertheless was precluded from considering Takahashi's testimony in deciding whether members of KZT were engaged in a pattern of criminal activity because "the law is well established that facts admitted as the basis for an expert's opinion are not to be considered for the truth of the matters asserted. (See, e.g., *People v. Coleman* (1985) 38 Cal.3d 69, 92 . . . .)"

The law concerning expert testimony has evolved since the briefing on appeal was completed in this case. In *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), the California Supreme Court concluded that "an expert's testimony regarding the basis for an opinion *must* be considered for its truth by the jury." (*Id.* at p. 679.) The court also distinguished between general background information and case-specific facts, and found that an expert may relate background information regarding his or her knowledge and

26

expertise, as well as premises generally accepted within his or her field, even though such testimony is offered for its truth. (*Id.* at pp. 683, 685 ["such background information has never been subject to exclusion as hearsay, even though offered for its truth"].) As relevant here, Takahashi was free to testify concerning general background information relating to gang culture and the "history and general operations" of KZT (*id.* at p. 698), including general background testimony about KZT's operations, primary activities, and pattern of criminal activities, which was unrelated to defendants or the current crimes (*People v. Meraz, supra*, 6 Cal.App.5th at p. 1175, review granted & transferred; accord, *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 411, overruled by *People v. Valencia* (2021) 11 Cal.5th 818, 839 & fn. 17). For all the foregoing reasons, we conclude there is sufficient evidence to support the jury's finding that KZT is a criminal street gang under the law existing at the time of trial.

### III

Luong contends the trial court erred in declining to instruct the jury on the crime of being an accessory to a felony in violation of section 32, thereby violating his federal constitutional rights to due process of law, to a fair trial, and to present a defense. According to Luong, such an instruction was required because his defense at trial was that "if [he] were guilty of anything, it would be of being an accessory under Penal Code section 32" based on Michelle B.'s testimony that after the shooting he told her to destroy the BMW.

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.

27

[Citations.]' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154, quoting *People v. Sedeno* (1974) 10 Cal.3d 703, 715-716.)

A lesser *included* offense is subsumed by the charged offense and as such is a general principle of law that requires proper instruction to the jury. (*People v. Birks* (1998) 19 Cal.4th 108, 117-118.) By contrast, the trial court has no duty to instruct on an uncharged, lesser *related* offense. (*People v. Rundle* (2008) 43 Cal.4th 76, 147-148 (*Rundle*), overruled on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *Birks,* at p. 136.) Neither the state nor federal Constitution requires that a trial court instruct on uncharged, lesser related offenses, even on request by the defense. (*Rundle,* at pp. 147-148; *Birks,* at p. 124; *Hopkins v. Reeves* (1998) 524 U.S. 88, 96-97 [141 L.Ed.2d 76].)

Here, Luong was not charged with being an accessory to a felony, and as he concedes, that offense is not a lesser included offense to murder or attempted murder. (*People v. Jennings* (2010) 50 Cal.4th 616, 668.) Because it was an uncharged, lesser related offense, the trial court had no duty to instruct the jury on the crime of being an accessory to a felony. (Cf. *Rundle, supra*, 43 Cal.4th at pp. 147-148.)

Nor, contrary to Luong's assertion, did the lack of an instruction on the crime of being an accessory to a felony deprive him of an adequate opportunity to present his defense. The California Supreme Court rejected a similar contention in *People v. Whisenhunt* (2008) 44 Cal.4th 174, 213, holding: "An accessory instruction was not essential to defendant's defense. Through defendant's testimony and defense counsel's closing argument, the jury was fully apprised of the defense theories that it was [someone else] rather than defendant who [committed the charged offense]." As the record in this case shows, Luong was not prevented from arguing to the jury that his culpability was limited to being, at most, an accessory. Indeed, during closing argument, Luong's trial counsel told the jury, "He's guilty of being [an] accessory after the fact, but that's not one of your choices," and, "He's guilty of helping [Nat] after the shooting." Thus, the lack of an instruction on being an accessory to a felony did not deprive Luong of an adequate opportunity to present his claims.

28

Moreover, being an accessory after the fact is not a defense to the charged crime of murder; it is a separate criminal offense. A defendant is liable for being an accessory when he or she "harbors, conceals or aids" a principal after a felony is complete. (§ 32.) Being an accessory to murder is not a defense to principal liability for the commission of a murder—it is a discrete crime. (See *People v. Jennings*, *supra*, 50 Cal.4th at p. 668 ["[b]eing an accessory to murder is not a defense to aiding and abetting the commission of murder—it is a separate criminal offense"].) Because accessory liability is not a defense to principal liability, Luong was not entitled to instruction on accessory to a felony as a defense to the charge of murder.

For all the foregoing reasons, the trial court did not err in declining to instruct on being an accessory to a felony.

IV

Luong next contends the prosecution's key witness Jimmy Luu was an accomplice as a matter of law, and thus, the trial court should have instructed the jury in the language of CALCRIM No. 335 [accomplice testimony: no dispute whether witness is accomplice], as requested, instead of CALCRIM No. 334 [accomplice testimony must be corroborated: dispute whether witness is accomplice]. As we will explain, the trial court properly instructed the jury in the language of CALCRIM No. 334 instead of CALCRIM No. 335.

Section 1111, which governs the use of accomplice testimony at trial, provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Section 1111 defines an accomplice "as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

" '[W]hether a person is an accomplice is a question of fact for the jury unless the facts and the inferences to be drawn therefrom are undisputed.' [Citations.]" (*People v. Johnson* (2016) 243 Cal.App.4th 1247, 1269.) To be an accomplice as a matter of law,

29

there can be no dispute that the witness was an accomplice, either with respect to the facts or the inferences to be drawn therefrom. The burden is on the defendant to prove by a preponderance of the evidence that a witness is an accomplice. (*People v. Fauber* (1992) 2 Cal.4th 792, 834 (*Fauber*).)

Failure to instruct on accomplice liability is harmless if there is sufficient corroborating evidence in the record. (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. The evidence is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth. (*Fauber, supra*, 2 Cal.4th at p. 834.)

Luong argues that Luu was an accomplice as a matter of law because "it was 'clear and undisputed' that [he] was not only 'liable to prosecution for the identical offense[s] charged' against [Luong], it was also 'clear and undisputed' that he was arrested and charged with those offenses." The People dispute Luong's argument that Luu was an accomplice as a matter of law, and argue in the alternative that any error in failing to so instruct the jury was harmless. The People are correct.

As the trial court observed, Luu consistently testified that he had nothing to do with the shootings. Rather, "the best he did was walk over to see what was going on, looked in the window, and then left. [¶] So, it's certainly not undisputed that he was an accomplice." Given Luu's testimony, defendants failed to sustain their burden of establishing Luu's liability as an accomplice as a matter of law. Thus, the trial court properly instructed the jury in the language of CALCRIM No. 334 (Accomplice Testimony Must be Corroborated: Dispute Whether Witness is Accomplice).

In any event, it is clear from the record that sufficient corroborating evidence was present to render any error harmless. Luong's car was parked at Randall's rental home behind the shopping center on the day of the shooting. Randall, Nat, and Luong were members of KZT, a rival of Hop Sing. Nat and Luong were often together in the weeks leading up to the shooting. Nat was driving the black BMW on the day in question. Shots were fired from the sunroof of the black BMW at Randall's direction. A casing

found in the black BMW after the shooting matched those found at the scene of the shooting. Luong was with Nat shortly after the shooting and instructed Michelle B. to destroy the black BMW. Such evidence sufficiently connected Luong with the shooting in such a way as to satisfy the jury that Luu was telling the truth. (See *Fauber, supra,* 2 Cal.4th at p. 834.) Thus, any possible error in failing to instruct the jury that Luu was an accomplice as a matter of law was harmless. (*People v. Lewis, supra*, 26 Cal.4th at p. 370.) This evidence of corroboration likewise rebuts Luong's claim that there was insufficient evidence to support his convictions because Luu's testimony was not corroborated.

V

Luong also claims the trial court erred in admitting evidence that vehicles parked in Michelle B.'s driveway were vandalized the night before she was scheduled to testify at trial. Luong asserts that the evidence should have been excluded as more prejudicial than probative under Evidence Code section 352. Villanueva joins in this argument. There was no error.

At trial, Michelle B. was permitted to testify, over defense objections, that at approximately 1:00 a.m. on the day she was scheduled to testify an unknown person smashed the windows of four vehicles parked in her driveway. Michelle thought the windows being broken had something to do with her testifying in this case because it happened the night before she was scheduled to testify and feared something could happen to her family. On cross-examination, Michelle acknowledged that Luong was in jail when the windows were broken and that nobody had threatened her about testifying in this case.

The trial court ruled that evidence the cars had been vandalized was admissible for the limited purpose of evaluating Michelle B.'s credibility and so instructed the jury. "Ms. [B] testified about the vandalism to her car [*sic*]. The witness's state of mind, when they are testifying to you, including if they were afraid or if they fear reprisal for their testimony, their state of mind is relevant to your assessment of their testimony, what credibility you give them, what weight you place on their testimony. So you can consider

her testimony about the vandalism of the car [*sic*] for what that may tell you about her state of mind as a witness as she was testifying to you. [¶] But you cannot consider it as evidence in itself as to the defendants' guilt. As you know, the defendants are all in custody. There is no evidence that they were aware of the vandalism to her car [*sic*], ordered it, instigated it, authorized it, encouraged it in any way. So you are not to consider that testimony by Ms. [B.] as reflecting on any conduct by the defendants themselves. [¶] It's relevant if you believe it is relevant to your assessment of her state of mind as a witness, but it is not evidence that the defendants were in any way involved directly or indirectly in the vandalism that occurred to her car [*sic*] that she told you about."

"Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his or her] credibility and is well within the discretion of the trial court." (*People v. Burgener* (2003) 29 Cal.4th 833, 869; see also Evid. Code, §§ 210, 780, subd. (f).) The standard for admission of such evidence is very broad. For such evidence to be admissible, the proponent does not have to show the threats or acts against the witness were done by the defendant personally nor does the proponent have to show the witness's fear of retaliation is "directly linked" to the defendant. (*People v. Gutierrez* (1994) 23 Cal.App.4th 1576, 1588.) "It is not necessarily the source of the threat—but its existence—that is relevant to the witness's credibility." (*Burgener,* at p. 870.)

The trial court has broad discretion in determining whether evidence is relevant, and if so, whether the evidence nevertheless should be excluded under Evidence Code section 352. We review the trial court's exercise of that discretion under the abuse of discretion standard. (*People v. Rogers* (2013) 57 Cal.4th 296, 326.)

Luong contends the standard for admissibility of third-party intimidation evidence is so broad that it violates the accused's due process rights unless Evidence Code section 352 functions as a meaningful limitation upon the admission of such evidence. Evidence of third-party threats, however, *is* limited by Evidence Code section 352.

32

(*People v. Mendoza* (2011) 52 Cal.4th 1056, 1085 [trial court has discretion "within the limits of Evidence Code section 352" to permit the introduction of third-party threats].) And, as we discuss below, the record demonstrates that the trial court performed a section 352 analysis and did not abuse its discretion in admitting the evidence here.

At trial, the defense argued that the evidence was unduly prejudicial because although the person responsible for the vandalism was unknown, there was a danger the jury would assume that the vandalism was related to Michelle B.'s testimony based on its timing. Luong's trial counsel went even further and asserted that by allowing Michelle to testify that the cars were vandalized the night before she was scheduled to testify, the court was "essentially telling the jury that Lam Luong threatened her. And that's tantamount to consciousness of guilt." In ruling that the evidence was admissible, the trial court acknowledged the possibility for misuse but found that it could be cured with a limiting instruction. "There is, on the [Evidence Code section] 352 balance, the possible misuse that the jury would assume that it indicates some consciousness of guilt or activity by the defendants, but I think that can be cured with a limiting instruction." This is precisely the sort of balancing test required by Evidence Code section 352, and the trial court acted well within its discretion in admitting the challenged evidence for the limited purpose of evaluating Michelle B.'s credibility as a witness, and by addressing any potential misuse with a limiting instruction.

The evidence was probative on the issue of Michelle B.'s credibility, and any prejudice resulting from the admission was substantially lessened by the court's limiting instruction. The trial court instructed the jury that it could consider Michelle's testimony about the vandalism for the limited purpose of assessing her credibility, but that it could not "consider it as evidence in itself as to the defendants' guilt." In addition, the trial court reminded the jury that "the defendants are all in custody," and "[t]here is no evidence that they were aware of the vandalism to her car [*sic*], ordered it, instigated it, authorized it, encourage it in any way." On this record, we find the risk of undue prejudice was low, and in light of its probative value, the trial court did not err in denying the defense's request to exclude it under Evidence Code section 352.

33

Johnson contends the trial court prejudicially erred "in failing to sua sponte instruct the jury that it was required to unanimously agree as to the specific criminal act that formed the basis for its verdicts of attempted murder in counts 1 through 4, and in connection with the premeditation and deliberation enhancement allegations as to each of those offenses." According to Johnson, "some jurors may have believed [he was] guilty based on one act, while others may have believed him guilty based on another, and there is a basis for disagreement among the jurors as to the act constituting the charged offenses and enhancements." The remaining defendants join in this argument.

"In a criminal case, a jury verdict must be unanimous." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) "Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Ibid.*) "The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed [his or her] guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Id.* at pp. 1134-1135.)

Johnson contends the prosecution asserted several theories of liability (direct perpetrator, aiding and abetting an attempted murder, and aiding and abetting based on

the predicate crime of disturbing the peace by challenging someone to fight), and that the theories of liability were based on "*various purported acts . . .* , any one of which might have constituted the offenses charged in counts 1 through 4 . . . ." Johnson identifies the following purported acts: (1) Luong fired shots at all four victims, intending to kill each one, and Johnson aided and abetted Luong; (2) Johnson fired shots at all four named victims, intending to kill each one; (3) Luong fired shots at only the victims he saw exit the car, intending to kill them, and Johnson aided and abetted Luong, and Johnson fired shots at the other two victims, intending to kill them; and (4) Randall fired shots at all four victims, intending to kill each one, and Luong and Johnson aided and abetted Randall.

As previously discussed, the jury must agree on a particular crime, "[b]ut unanimity as to exactly how the crime was committed is not required." (*Russo, supra*, 25 Cal.4th at pp. 1134-1135.) In other words, "the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.]" (*Id.* at p. 1135.) Here, there was no risk that the jury would divide on two discrete crimes and not agree on any particular crime. Rather, the evidence presented the possibility the jury may divide, or be uncertain, as to the exact way Johnson was guilty of a single discrete crime. The same is true with respect to the other defendants. Accordingly, a unanimity instruction was not required. (See *ibid.*)

VII

Villanueva next contends the evidence regarding his prior contacts with police should have been excluded on hearsay grounds and its admission violated his Fifth Amendment right to confrontation under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177]. We agree the trial court erred in admitting the challenged evidence but conclude the error was harmless beyond a reasonable doubt. Because we have already concluded Villanueva's conviction must be reversed, we restate our resolution of this contention to guide the trial court on remand.

At trial, Takahashi testified that he considered the following contacts in forming his opinion that Villanueva was a Viet Pride gang member. In February 2010, a law enforcement officer observed Villanueva at a Starbucks on Florin Road with Luu, a verified Viet Pride gang member, and Luong, a verified KZT gang member. In March 2006, Villanueva was contacted with David Le, a verified Viet Pride gang member, in connection with a robbery investigation. Later that same day, Villanueva was contacted with Le and Tommy Tran, a verified Viet Pride gang member, for a curfew violation. In April 2006, Villanueva was contacted with his brother Aaron and Sonny Luu, Hop Sing gang members, during a vehicle stop. A gun was found in the car, and Villanueva claimed that the gun belonged to him. In February 2008, Villanueva was involved in a fight at a movie theater along with several Asian males during which participants were heard yelling the word "Crips." In July 2008, Villanueva was arrested when marijuana was found in his room during a probation search. He later was found in possession of MDMA during a vehicle stop. In August 2008, Villanueva was arrested for possession of MDMA while in the presence of Viet Pride gang members and associates. In July 2010, Villanueva was contacted in a car with Viet Pride gang members, and police found guns and crystal methamphetamine inside the car. In May 2011, Villanueva was contacted in a car with three Viet Pride gang members.

"If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception." (*Sanchez, supra*, 63 Cal.4th at p. 684.) "Ordinarily, an improper admission of hearsay would constitute statutory error under the Evidence Code. Under *Crawford*, however, if that hearsay was testimonial and *Crawford*'s exceptions did not apply," its admission "would also be an error of federal constitutional magnitude." (*Id.* at p. 685.)

Here, it is clear from the record that most, if not all, of Takahashi's testimony concerning Villanueva's contacts with Viet Pride gang members constituted hearsay in that it consisted of out-of-court statements that were offered for the truth of the matter

36

asserted.  (Evid. Code, § 1200, subd. (a); *Sanchez, supra*, 63 Cal.4th at p. 684.)

Takahashi testified that he obtained the information by "reviewing reports, interviews

that [he] participated in, and in speaking with other Asian gang experts."  Thus, it appears

his testimony was not based on his personal knowledge.  The record also indicates that at

least some of his testimony was gleaned from police reports or similar materials.  In

addition to Takahashi's testimony that he obtained some of the information by reviewing

reports, Takahashi testified about various incidents in which Villanueva was contacted by

law enforcement and observed to be in the company of Viet Pride gang members,

including a vehicle stop conducted by Officer Hasegawa of the Sacramento Police

Department, and an arrest by the Sacramento Police Department.  The police reports and

similar material were testimonial.  (*Sanchez,* at p. 694.)  And because the prior contacts to

which Takahashi testified involved Villanueva, his testimony consisted of case-specific

facts.  (*Id.* at p. 676.)  Accordingly, the admission of the challenged evidence violated

state law and Villanueva's rights under the confrontation clause.  As we will explain,

however, the error was harmless beyond a reasonable doubt.

"Confrontation clause violations are subject to federal harmless-error analysis

under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705]."  (*People v.

Geier* (2007) 41 Cal.4th 555, 608.)  Under *Chapman,* the People must prove the errors

were harmless beyond a reasonable doubt, that is, the errors did not contribute to the

jury's verdict.  (*People v. Houston* (2012) 54 Cal.4th 1186, 1233; *Sanchez, supra*,

63 Cal.4th at p. 699.)  " 'To say that an error did not contribute to the ensuing verdict

is . . . to find that error unimportant in relation to everything else the jury considered on

the issue in question, as revealed in the record.'  [Citation.]  Thus, the focus is what the

jury actually decided and whether the error might have tainted its decision."  (*People v.

Neal* (2003) 31 Cal.4th 63, 86.)

Villanueva asserts that the admission of such "highly inflammatory activities,

which were not established by the adjudication of convictions, was highly prejudicial in

light of the dearth of evidence of [his] involvement in gang activities."  He also claims

that the challenged evidence "allowed the jury to ascertain a motive for [his]

37

involvement, and to congeal the liability for this brutal shooting against anyone with any known ties to gangs that was at the scene of the shooting."  We disagree.

Putting aside the challenged evidence, there is overwhelming evidence that Villanueva was a member of or affiliated with Viet Pride and was motivated by his membership in that gang when he committed the target crime of challenging Saechao to a fight.  Luu testified that he had known Villanueva for five or six years, and when asked whether Villanueva had any gang affiliations, Luu responded that "he was hanging out with us.  We was known as Viet Pride Crips."  Both Luu and Takahashi testified that Villanueva had a "Rest in Peace, Gia Huynh or aka Yogi" tattoo, which was a common tattoo of Viet Pride gang members.  Takahashi also identified two photographs of Villanueva posing with KZT and Viet Pride gang members.  In addition, Villanueva was with KZT and Viet Pride gang members on the day in question.  He and another Viet Pride gang member, Do, confronted a Hop Sing gang member, called him "Hop Chop," told him that he was in their territory, and challenged him to come outside and fight.  When Luu asked Villanueva and Do what was going on, one or both of them told Luu that there was a "Hop Chop" inside.  The shopping center where the shooting took place was a known gathering place for KZT gang members.  Significantly, much of Villanueva's activity on the day in question, including his presence outside the store, his contacts with Saechao, and his association with Randall and Johnson, Do, and Luu, was captured on videotape and shown to the jury.  Given this evidence, no reasonable juror could conclude that Villanueva's actions were not gang motivated, and any error in admitting evidence of Villanueva's prior contacts with police was harmless beyond a reasonable doubt.

## VIII

Randall claims that his conviction for possession of MDMA for sale must be reversed because there is insufficient evidence to show that he knew there was any contraband in the bedroom closet where the MDMA was found and/or that he exercised individual or joint dominion and control over the drugs.  We agree.

38

At trial, evidence was presented linking Randall with three separate residences. The first was an apartment on Power Inn Road that he had registered with the parole department. Police searched that apartment and found two bags each containing 10,000 empty pill capsules. The police also found 100 to 200 red capsules filled with an unknown white substance.

The second residence was a house Randall rented on Casa Grande Way. Police searched that residence and, in addition to the .45-caliber semiautomatic firearm found in the toilet tank, found four baggies each containing between 13 and 121 grams of cocaine.

The third residence was a house on Glen Rachael Court. Based on information obtained from Randall's GPS monitor, police were able to determine that after the shooting, Randall went to the apartment on Power Inn Road and then to a house on Glen Rachael Court, where he stayed for less than five minutes. Police searched that house at 1:45 a.m. on January 13, 2012, and found two kilos of MDMA, along with two pairs of women's size small sweatpants and a pair of men's athletic shorts inside a duffle bag in a bedroom closet. They also found $6,790 in cash and miscellaneous receipts and paperwork in an envelope under the mattress. In addition, there was a photograph of Randall and his girlfriend on the refrigerator in the kitchen. The MDMA found in the bedroom closet on Glen Rachael Court forms the basis for Randall's conviction.

"The essential elements of unlawful possession of a controlled substance are 'dominion and control of the substance in a quantity usable for consumption or sale, with knowledge of its presence and of its restricted dangerous drug character. Each of these elements may be established circumstantially.' [Citations.]" (*People v. Martin* (2001) 25 Cal.4th 1180, 1184.) Possession may be demonstrated by actual physical possession or constructive possession. (*People v. Williams* (1971) 5 Cal.3d 211, 215.) "Constructive possession occurs when the accused maintains control or a right to control the contraband; possession may be imputed when the contraband is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control, or to the joint dominion and control of the accused and another." (*Ibid.*)

39

"[T]he totality of circumstances will determine whether a defendant has exercised the requisite control over contraband in the hands of another." (*Armstrong v. Superior Court* (1990) 217 Cal.App.3d 535, 539.) We thus review the evidence in its entirety, rather than consider isolated bits of evidence. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1203.)

The People contend that based on the facts set forth above, "it was certainly reasonable for the jury to find Randall guilty of the possession of a controlled substance for sale charge." "Every house associated with [Randall] contained drugs and other evidence . . . that was consistent with possessing drugs for sale," "there was undeniable evidence that Randall was inside the Glen Rachael Court house just hours before it was searched and the drugs were found," and "a picture of Randall and his girlfriend was found on the refrigerator in the house, providing even further evidence of his connection to that house."

While there is evidence Randall visited the house on Glen Rachael Court several hours before the MDMA was found, "more than mere presence must be shown in order to prove constructive possession: the People must also show that defendant had dominion and control over the contraband." (*People v. Jenkins* (1979) 91 Cal.App.3d 579, 584.) Such evidence is missing in the case. There is no evidence linking Randall to the bedroom in which the MDMA was found, such as clothing, mail, paperwork, pictures, or fingerprints. While Randall's picture was found on the refrigerator in the kitchen, there is no evidence that he lived there. There is no evidence he had a key to the house or that anything in it was his. Indeed, there is no evidence as to who owned or rented the house. Even assuming the jury could infer from the evidence collected at the other two residences that Randall was a drug dealer, there is insufficient evidence from which a jury reasonably could conclude that he possessed the MDMA found in the Glen Rachael Court house for sale or any other purpose. His presence at the house hours earlier and his photograph on the kitchen refrigerator alone do not establish that he maintained control or a right to control the MDMA found in the bedroom. Accordingly, we will reverse Randall's conviction for possession of MDMA for sale.

IX

Luong contends, and the People agree, that he is entitled to additional days of presentence custody credit. The trial court granted Luong 730 days of custody credit, consisting of 635 days for actual time in custody, plus an additional 95 days of good conduct. Luong, however, was in custody for 652 days (from the time of his arrest on August 2, 2012, through his sentencing on May 16, 2014), which entitled him to 97 days of good conduct credit (15 percent of 654 is 97.8). Accordingly, Luong was entitled to a total of 749 days of custody credit when he was originally sentenced. When Luong is resentenced on remand, the trial court's order must reflect that Luong was entitled to 749 days of custody credit when he was originally sentenced.

X

In supplemental briefing, defendants contend we must remand this matter for the trial court to consider whether to strike the section 12022.53 firearm enhancements. We agree as to Luong and Johnson, whose convictions for attempted murder we affirm.

At the time of defendants' sentencing, the imposition of the section 12022.53 enhancements was mandatory, and the trial court had no discretion to strike them. (Former § 12022.53, subd. (h) ["Notwithstanding Section 1385 or any other provision of law, the court shall not strike an allegation under this section or a finding bringing a person within the provisions of this section"].) On January 1, 2018, Senate Bill No. 620 (2017-2018 Reg. Sess.) went into effect. (Stats. 2017, ch. 682, §§ 1-2.) Senate Bill No. 620 amended sections 12022.5 and 12022.53, removing the bar on striking a firearm enhancement and granting the trial court discretion pursuant to section 1385 to strike or dismiss an enhancement. (§§ 12022.5, subd. (c); 12022.53, subd. (h).)

Defendants contend, and the People agree, that the amendments to sections 12022.5 and 12022.53, potentially providing for lesser punishment, are retroactive to cases not yet final. (See *In re Estrada* (1965) 63 Cal.2d 740; *People v. Francis* (1969) 71 Cal.2d 66, 75-76.) We agree. (*People v. Woods* (2018) 19 Cal.App.5th 1080, 1091.)

While the People acknowledge that the amendments to sections 12022.5 and 12022.53 apply retroactively, they assert that "not all [defendants] benefit from the new

41

statutory changes." According to the People, remand is not appropriate as to Luong, Randall, and Johnson because "[t]here is no reason to believe that the sentencing court would exercise its new discretion to strike the firearm enhancements for" those defendants. (See *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896 [no remand for resentencing on similar issue because the trial court already made its position clear].) We are not persuaded.

In support of their assertion, the People note that the sentence imposed on Villanueva and Do, 32 years to life, was substantially less than the 118 years to life recommended by the probation department, and contend that "the court did not offer any such sentencing breaks to the other three [defendants]." The People's observation about Villanueva and Do is correct, but their assertion that Luong, Randall, and Johnson were not given any sentencing breaks is not. The probation department recommended that Luong be sentenced to 118 years to life, Randall be sentenced to 177 years to life, and Johnson be sentenced to 166 years to life. The sentences imposed, however, were significantly less. Luong, Randall, and Johnson were sentenced to 64 years to life, 88 years to life, and 83 years to life, respectively. While the trial court's decision to run two of the attempted murder sentences consecutive as to Luong, Randall, and Johnson (instead of concurrent as it did for Do and Villanueva) is potentially suggestive, the record does not clearly indicate that the trial court would not, in any event, have exercised its discretion to strike one or more of the section 12022.53 enhancements had it been possible to do so at the time of the original sentencing. We will thus remand this matter for the trial court to have an opportunity to exercise its sentencing discretion on the firearm enhancements imposed on all defendants under section 12022.53.

We express no opinion as to how the trial court should exercise its newly granted discretion on remand. We only conclude that, under the circumstances of this case, the trial court should be provided the opportunity to exercise its discretion in the first instance. (See *People v. Brown* (2007) 147 Cal.App.4th 1213, 1228 [noting that it is generally appropriate to remand for resentencing when a court proceeded through sentencing erroneously believing it lacked discretion to act in a certain way].)

42

## XI

Johnson filed a supplemental brief seeking a remand for resentencing for the trial court to exercise its discretion under Senate Bill No. 1393 to strike a five-year prior serious felony enhancement in the interest of justice. The People agree that a remand is appropriate.

Johnson received a five-year sentence enhancement pursuant to section 667, subdivision (a)(1) for having been previously convicted of a serious felony. At the time of sentencing, the trial court had no authority to strike a prior serious felony conviction in connection with the imposition of a section 667 enhancement.[5] However, Senate Bill No. 1393, which became effective January 1, 2019, "delete[d] the restriction prohibiting a judge from striking a prior serious felony conviction in connection with imposition of the 5-year enhancement . . . ." (Legis. Counsel's Dig., Sen. Bill No. 1393 (2017-2018 Reg. Sess.).) Because the judgment is not yet final, the change in the law will apply to Johnson retroactively. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971-973.)

We will remand the case to give the trial court the opportunity to consider striking Johnson's prior serious felony enhancements pursuant to section 667, subdivision (a).

## XII

Defendants contend in supplemental briefing on transfer from the California Supreme Court that the gang enhancements are no longer valid as a result of changes to the law in Senate Bill No. 333 (2021-2022 Reg. Sess.). The People agree with this contention and urge this court to reverse those enhancements and remand for retrial. We agree as to Luong and Johnson.

While this appeal was pending, Assembly Bill 333 amended the language of section 186.22 to modify the showing necessary to prove gang offenses and gang enhancements. (Stats. 2021, ch. 669, § 3, eff. Jan. 1, 2022.) The amendment contains

---

[5] Prior to the enactment of Senate Bill No. 1393, subdivision (b) of section 1385 stated: "This section does not authorize a judge to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667."

new definitions of "criminal street gang" and "pattern of criminal gang activity." It also changed the requirements for proving actions benefited a criminal street gang. (§ 186.22, subds. (e), (f), & (g).) The People agree defendants are entitled to reversal of the gang enhancements because the record does not clearly establish the People proved the new requirements for a gang enhancement. They acknowledge the evidence is unclear as to whether the predicate offenses provided a common benefit to the gang or that the benefit was more than reputational, under the amended statute. (§ 186, subd. (e)(1), as amended.) The People also agree the amendments apply retroactively to defendants. Thus, we will reverse and remand for a new trial on the gang enhancements as to Luong and Johnson. Also, if Do, Randall, and Villanueva are retried for crimes with gang enhancements, the amended version of section 186.22 will apply.

## XIII

In a supplemental brief, Luong asks for the case to be remanded pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 so he can make a record of information for an eventual youth offender parole hearing. The People agree. Luong may make a *Franklin* record on remand.

## XIV

Relying on *People v. Duenas* (2019) 30 Cal.App.5th 1157, Luong contends the trial court violated his federal and state rights to due process by imposing some of the fines and assessments without determining his ability to pay, even though he did not object to the imposition of the assessments and fines at sentencing. Johnson did not join in the arguments concerning ability to pay assessments and fines.

Although there is precedent for forfeiture based on failure to object at sentencing (see, e.g., *People v. Pack-Ramirez* (2020) 56 Cal.App.5th 851, 859-860), the People acknowledge that because the matter must be remanded on other issues as to Luong, he may request a hearing to present evidence on the ability-to-pay issue on remand. Under the circumstances, we need not address this contention.

44

## DISPOSITION

As to Do, Randall, and Villanueva, the attempted murder convictions and accompanying enhancements are reversed and remanded to permit the People to seek retrial. As to Randall, the conviction for possession of MDMA for sale is reversed and remanded with directions to enter judgment in favor of Randall on that count.

As to Johnson and Luong, the attempted murder convictions are affirmed. The gang enhancements are reversed and remanded to permit the People to seek retrial. The sentences are vacated. The trial court is directed to properly reflect Luong's original custody credit, allow Luong to make a record of information for an eventual youth offender parole hearing, allow Luong to request a hearing on his ability to pay fines and assessments, exercise its discretion with respect to striking firearm and prior serious felony conviction enhancements, and conduct further proceedings consistent with this opinion, including resentencing Johnson and Luong.


/S/
MAURO, J.

We concur:


/S/
ROBIE, Acting P. J.


/S/
DUARTE, J.